This is Frank Peake. Is she really with us? She's bloody alright. Alright. You may proceed, counsel. May it please the court. My name is David Marcus and it is my honor to represent Frank Peake before this court today. I was hoping that I could request three minutes for rebuttal. You may have that. Thank you, Chief Judge. After assuring the district court that it wouldn't appeal to Puerto Rican jurors as victims, the government did just that. The prosecutor stressed its theme that this case was about Puerto Rico and started its opening statement this way. Ladies and gentlemen, shipping is very important to Puerto Rico. It continued, this conspiracy was so significant that it affected billions of dollars of freight to and from Puerto Rico. Billions of dollars. This case is about Puerto Rico because the conspiracy affected so much of what is sold here and what is exported from here. I thought the court at some point gave an instruction on that specifically. It did, Your Honor. What did they say? What did the court say? It gave two instructions throughout the case. It said that the jury should not be swayed by bias or sympathy to Puerto Rico. The problem, Your Honor, is that the government did this again and again even after the instruction. It made comments like- Those comments were in the opening. They were, and then they called two witnesses, one from- So your case is based not only on the opening statements but on the questions of two witnesses. Yes, Your Honor, two of the six witnesses and the theme that was stressed in closing as well. It was stressed from the beginning- No, no, no. What was said in closing? Sure. What was said in closing was they mentioned Burger King again, they mentioned Office Depot again, they mentioned Walgreens and Walmart again. It wasn't-at that point they had been admonished so many times that they didn't actually come out and say that the prices for those goods were more in the closing, but throughout the two witnesses that they were called, they argued that the school lunch program cost more and that the government had less money. In fact, what the district court said before reading the instruction was that this gives the impression that the children are affected, you know, and this is really out of bounds. This is really way out of bounds. It is one thing to say that this case comes to Puerto Rico. It is another thing to say that the United States should be able to exploit arguments and exploit emotion and exploit sympathy. That's at page 592 of the appendix. And to go back to Judge Torreya's point, the jury was specifically instructed because of the concerns expressed by the district court, and normally we would consider that adequate. Why wasn't it adequate here? For at least three reasons, Your Honor. First, it permeated the whole trial. Second, the defense was not permitted to combat those statements or arguments or evidence with evidence of reasonable pricing. We were precluded by emotion and limine and the judge's instructions, which we followed, that we couldn't argue that the school lunch program wasn't affected or that the Burger King Whoppers weren't affected. And third, when jurors themselves are victims of the crime, they can't be expected to ignore repeated plays on their sympathy. The government here incited the jury to abandon their reason and decide the case on emotion and bias. And that's not what we have juries to do. It's just the opposite. Let me turn to my second issue, which I think is a really important issue here, which is the motion to suppress. The motion to suppress the documents found on Mr. Peek's BlackBerry and laptop should have been granted. In 2008, the magistrate judge took great pains to limit what could and could not be searched. And the magistrate judge specifically crossed out Mr. Peek's laptop and phone in attachment A. Attachment A was the attachment of things that could be searched. Now, of course, other computers at the company, at Mr. Peek's company, could be searched. And attachment B did not alter this. Attachment B is what items could be seized from those items that could be searched in attachment A. And so, yes, e-mails are allowed in attachment B to be seized because they could be searched from the company computers, but not from Mr. Peek's BlackBerry or laptop. Well, you know, I read paragraph F of the search warrant as specifically including BlackBerrys. Paragraph F, Your Honor, is from the description of property to be seized, attachment B. What that is describing is things that could be seized from the places allowed to be searched in attachment A. And this is so critical. The judge said in attachment A that Mr. Peek's BlackBerry and laptop could not be searched. Therefore, the e-mails that he's talking about in attachment B are from the company servers. The company computers. And that's what's critical here. Additionally, what the – Well, excuse me, but I'm – if you read this literally, the fact that it was eliminated from one part of the search warrant does not mean that it's also eliminated from another part of the search warrant where it specifically is included. It does, Your Honor, and let me explain why. Excuse me. The district judge heard all of your arguments on this and said, the court finds that the first search warrant issued by the magistrate judge properly authorized the search and seizure of Peek's laptop and BlackBerry and other electronic devices, notwithstanding your argument, just as Judge Torea has said. So what is our standard of review? It's de novo, Your Honor. Why? Whether the search warrant covers these items is subject to de novo review. And let me just add, it's not just me who believed that this didn't cover it. The government sought a second warrant, Your Honor. The government went to Washington, D.C. The district court was willing to make certain assumptions in your favor, but said nonetheless your premise is absolutely wrong, that on a reading of the search warrant, just as Judge Torea has said, the warrant encompassed all of the materials you are now seeking to suppress. I agree the district judge made that finding. That's why we're here, because the district judge got it wrong, Chief Judge. And the reason the district judge got it wrong, and this is so critical, if you look just at Attachment B, like Judge Torea says, it does include e-mails. But that Attachment B, if you look at the very top of it, on the first page, Appendix S5, this is describing the description of property to be seized. So, yes, they could seize the e-mails, but only from the places authorized in the search, which is in Attachment A. Attachment A only authorizes the search. Okay, counsel, let's assume you're wrong. Therefore what? Well, if I'm wrong, then they were allowed to seize those items, but only look at them for 30 days, as the face of the warrant says. And under that Second Circuit case, making a mirror image and keeping it for four years was unreasonable. That's Gnaeus at 755 F3rd 125. They weren't allowed to hold that mirror image for four years and then search it later when the face of the warrant says they only had 30 days to do so. That made it unreasonable, even if the court finds that the warrant encompassed it, which it didn't. My final argument that I'd like to – Excuse me. Before you go into your final argument, because maybe you can include it in your answer, isn't there a certain amount of at least ambiguity between one and the other, which would lead someone that's effectuating the search to a good faith? Do you know where I'm leading? I do, Your Honor. And the answer is no, because of – I don't think there is any ambiguity that when a judge crosses out Peek's personal laptop, that that's what he means. But second of all, there's certainly no ambiguity. Well, the very fact that you have a district judge disagree with you seems to be – would support an argument of ambiguity. Well, even putting that aside, there's nothing ambiguous about waiting four years to search it. That's certainly under the case law unreasonable under any respect. So waiting four years to search something that they seized in 2008 under any reading is unwarranted, and that second warrant doesn't save them. The case law is clear on that as well under Ganias, that seeking a second warrant to say, well, we've waited four years, give us another opportunity here, does not save them under the good faith argument. The last argument I'd like to – Well, why wouldn't it? I don't follow your logic. Well, if it was unreasonable to hold it for more than 30 days, it should have been returned at that point. And what Ganias says – You kept the equipment. Didn't they just have a duplicate copy? Yes, but the mirror image is – and that's what the new cases say is it's having the same thing. There's no difference between the mirror image and the actual underlying computer. Well, of course there is. The defendant continued to be able to use the underlying equipment thereafter. Right, no, no, of course, but then there would be no sort of limitation on when the government – the government would just always seize and hold and wait however long they wanted and get a second warrant. And what the Second Circuit said in that case is that would be an unreasonable time allowance for the government to have our possessions and then be able to search them at their leisure. So that's the argument there. The final argument I'd like to raise is dealing with whether Puerto Rico is a state for the Sherman Act. The government has successfully argued to this court again and again. Hasn't this court resolved that problem? Yes, it has. All right, and is there an exception to stare decisis because the government makes an argument? No, there isn't. There's no exception to stare decisis, but this court en banc held – Counsel, we're well aware of all of this. Yes, Your Honor, and so that Cordova case does not survive this court's en banc case, and it does not – it is no – it was not good law under Schell, and it's not good law under Irgartua. Well, this is a Supreme Court case involving a three-judge court out of this district in which they held that the three-judge court statute, which specifically talks about states applies to Puerto Rico, so – That three-judge statute case does, but what we have here under the – Well, excuse me. Are you just going to keep on going? No, the difference with that case, Your Honor, is the Sherman Act differentiates between states and territories, and what it says in Section 3 is that the Sherman Act criminalizes antitrust violations between territories and any state. They did not charge Section 3 here, and under Schell Oil, the only way that Puerto Rico could become a state is by congressional action. Irgartua is very clear on that as well. So under Section 1, which criminalizes only antitrust violations among the several states, they charged it wrong here, Your Honor. They charged it wrong.  Thank you, Your Honor. Thank you. Good morning. May it please the Court, I'm Shawna Wallace for the United States. I'd like to start by responding to some of the defendants' arguments on the search warrant. First, to be clear, Attachment A was titled Premises to be Searched. The magistrate judge here crossed out four specific mentions of BlackBerry and computer and cell phone. He left in the description of items to be seized a much broader, more expansive category of all electronic storage devices, processing devices, et cetera. And that Attachment B specifically mentions BlackBerrys. Well, Counselor, if Attachment A prohibits their search, presumably the person doing the search would not come across the items. So how is it that you can prohibit them from being looked at, but nonetheless say that you have a right to seize them? So I think what the magistrate was doing here was clarifying the parameters of the search warrant so that it was clear for the officers going in what they were allowed to look at and search and seize. So rather than the more limited language under Premises to be Searched, which is not where it fit, the magistrate also helpfully provided some grammatical corrections to the warrant, but left a much more expansive definition, which does cover those items to be seized. And it would be irreconcilable with his handwritten notes on the cover of the warrant, giving directions as to how to treat any items that are searched or seized that include all electronic storage devices, if he didn't intend for those to be included within the terms of the warrant. Why aren't they electronic devices within the parameters of what he allowed to be searched in the first place, which excluded the defendant's personal Blackberry and computer? While he crossed out those specific words that were more limiting in Premise A, in Attachment A, I don't think that if the prosecutor had taken this edited warrant and gone back and retyped it up so that all of the edits were made that the magistrate put in there and then brought it back for signature, we wouldn't be here. Because if you look at the very broad definition of all electronic devices and storage devices and materials in Attachment B, that would clearly cover the Blackberry that was assigned to Peek from his company and the computer assigned to Peek from his company that were actually imaged on site. Now, the defense counsel also addressed the fact that they were imaged on site and some of those images were not searched until later. He's relying on a case, Ganeas, which he misdescribes. There the government executed an initial search warrant involving one crime. It was towards an accountant and it was the crime they were investigating were some of his client's alleged acts and then kept all the material and several years later went back to get a search warrant to look for an entirely different crime looking for what the accountant did. And there the court said you can't hold material for an extended period of time and look for evidence of a different crime, you know, years later. Here the images that the government sought to review years later were related to the exact same crime that was being investigated all along and described in the terms of the original search warrant. Actually, there's a First Circuit case that is directly opposite, which no one has named, but that doesn't matter. My apologies, Your Honor. Well, no, it's a difficult question. If materials are in law enforcement files from a prior investigation, when you have a new investigation, can you go look at them? The answer is hard, very hard, and may depend on the context. I would agree, Your Honor. Fortunately, in this case, it doesn't implicate any of those difficult questions. But I want to make sure I'm answering your question. I'm still trying to figure out, when the magistrate judge crossed out certain things, in other words, put certain things off limits, what did that mean? Did that mean something? Well, the effect of it, and I think Judge Torea's phrasing earlier was on point, what is the literal meaning of the warrant? All it means is that language is no longer in the warrant. But the actual text of the warrant remains, and that's what guides the agent's search. So, again, for the example, if the prosecutor had just retyped up this warrant and then had left out those four very limited categories of electronic storage devices, but left in the very expansive several-paragraph definition of electronic storage devices, there would be no question that that covered the company computers and BlackBerrys that were assigned to Peek and which were imaged on site. I don't disagree with that. The problem is the magistrate judge was presented with a very different warrant, though, and made some decisions about what shouldn't be touched. And I'm just trying to figure out what to make of what the magistrate judge specifically decided. Right. And I think the only thing we can do is look at what is literally left in the warrant, because the agents and the trial attorneys have no choice other than to be guided about what is literally left in the warrant. And here, it was an incredibly expansive definition. And these devices never actually left the premises. It never even triggered that 30-day language on the cover of the warrant, because they were just imaged on site. And the only documents that were ever admitted to trial, the 15 exhibits, were related to the exact crime that was being investigated at that point. I would like to turn. Yes, we'd like you to turn to the government's emphasis on the harm to the citizens of Puerto Rico. It was sufficiently bad that the trial judge told you something about it and was forced to give instructions. Yes, Your Honor. The prosecutor's opening statements, which have to be looked at in context, the challenge statements in particular were doing two things. One, it was highlighting for the jury two victim witnesses out of the hundreds and hundreds of victims, but just the two victim witnesses that we'd be called later in trial who would be testifying as to live issues in this case, including the interstate commerce element, which is still at issue on appeal, and, of course, providing some corroborating testimony to the very lengthy testimony that was provided by the three closest co-conspirators. The prosecutor was also looking to introduce this jury to the concept of an antitrust violation and why it's important, why it's a felony, why they're being asked to sit in judgment and convict the defendant of a felony. This court, the district court, had already on two occasions during voir dire a day or two before flagged for the jury that this was not a typical felony criminal case that they may be thinking of. He used the examples of carjackings and murders and drug cases. The prosecutor was entitled to let the jury know that this was still a serious crime and deserving of convicting the defendant of a felony. It's not a victimless crime. Furthermore, the argument that this was somehow the theme of the government's case is irreconcilable with this record. There were two weeks of testimony, the lion's share from the three cooperating co-conspirators, and it was a march through over five years of conspiracy document outlining how the conspiracy worked and Mr. Peek's role in supervising the conspiracy, corroborated by contemporaneous emails documenting the supervision, to do a very rough proxy. The idea that these two victim witnesses provided somehow the theme of the case of consumer end harm. I'll be clear, they were never asked any questions, nor were any responses elicited that actually addressed end consumer harm. But the idea that they formed somehow the theme of the case in a 1,300-page trial transcript, both of those witnesses in total took up about 43 pages. Yeah, but it's still, to suggest that the school lunch program in Puerto Rico did not have enough money for food because it had to pay a higher transportation cost, is sort of below the belt. To the extent the prosecutor commented this was not evidence elicited from the witness cause concerned, yes, I'd point to the court's very direct, forceful curative instruction that was given with input from defense counsel as he crafted it. And it was not a boilerplate instruction. With input from defense counsel? Yes, both counsels submitted suggestions for this. And this was not a boilerplate instruction. This was a platinum standard directly on point to what caused concerns, where he told them not to decide this case based on pity and sympathy to Puerto Rican businesses, to Puerto Rico or to Puerto Rican consumers. Sympathy to Puerto Rico is to play absolutely no role in your consideration of this case. Any statement that you may have taken to imply otherwise is an erroneous interpretation. I don't want you to have that interpretation. Any effect on Puerto Rico is not to be considered at all. And in case there was any question, he made sure to add this case is about a potential conspiracy in violation of the antitrust law on whether or not the defendant, Mr. Frank Peek, joined the conspiracy. And he made sure to refocus the jury's attention and then repeated this in closing instructions as well. Furthermore, this was in opening statements, not in closing statements, that have traditionally caused more concern. There were two weeks of trial evidence, which the district court has described as overwhelming. The jury deliberated for a substantial amount of time at a day and a half, asked to review certain kinds of evidence. So the idea that these isolated, somewhat ambiguous comments in opening, when looked at in context, led to the jury two weeks later to return an inflamed verdict not based on the evidence. Again, it's not reconcilable with the actual process of the case. Your Honors, if there are any other concerns or questions about the remaining issues, I'd be very happy to answer them. The Puerto Rico issue. I think, Your Honors, I'm captured in the questioning. From the Supreme Court, the case Judge Torrea was mentioning there with Calero Toledo versus Pearson Yacht. From Shell onward, those are Supreme Court cases where the Supreme Court has laid out the analytical approach to looking at whether or not Puerto Rico is a state for any given constitutional or statutory provision. You start with the text. If it's not clear there, you look to affect the intent of the framers. This Court has held on repeated occasions that it is consistent with the intent of the Framers of the Sherman Act that Puerto Rico, after becoming a commonwealth in the early 1950s, should be treated as a state. Well, their argument is that you charge under the wrong provision in Sherman. Yes, and we would... The wrong provision specifically talks about the territory you didn't charge under that one. No, exactly. Before Puerto Rico became a commonwealth in the early 1950s, it would fit under Section 3 of the Sherman Act. This Court has held in Cordova, Arroyo Malicio, R.W. International, that since Puerto Rico became a commonwealth, it's no longer properly considered under Section 3, where you can look at purely intrastate commerce. It is now to be treated as a state, and you have to allege and prove the interstate commerce element. And there is no case law on point that says that this Court has reconsidered its interpretive approach to looking at statutes and constitutional provisions, nor that this Court has caused to reconsider the intent of the Framers of the Sherman Act to conclude that Puerto Rico should not be a state for these purposes, that Defense Counsel has not actually made either of those arguments, which would be required. Thank you. We ask the Court to affirm. Thank you very much. May it please the Court. Let me start with the search warrant issue where the government started. And I think the key here is the question to Judge Thompson's question, what did it mean to cross out that language? And what the government would say is it meant nothing. It meant nothing at all to cross out that language. And this is ‑‑ No, that isn't what the government says. What the government says is that in some ways the crossing out of that language was an effort to reduce ambiguity, to make it clear that the second clause, what you can seize, was not limited by the first clause, and that the best way of reading this is it's implicit that if you can seize something, you can search for it. Your Honor, they have to be read together. I agree with you. You can only seize things from places where you're authorized to search. They couldn't go to his home, for instance, and take his e‑mails. No, your argument is that the clause that was eliminated necessarily limited the clause that remained. But the point is it was eliminated. If it had remained, you might have had a better argument than you do. No, your Honor. The part that was crossed out limits where you can search. That's the whole point of attachment A. There's two different attachments here. They're separate documents. Attachment A says here are all the places you can look, listing the company servers, listing different places. From those places that you're authorized to look, you can seize the following things. That's what attachment B says. They have to be read together like that. And now the absence of the first attachment. If you were to type this up clean, what would that mean? That would mean that only the places in attachment A that were left, like the company servers, could be searched. What the magistrate was doing there in attachment A is there's a whole number of things that can be searched. Company servers, the premises, file cabinets. He crosses out Peek's laptop and computer. That limits what can be searched, what can be looked in. From those other places, you can seize all the things listed in attachment B. By the way, he crosses out personal palm pilots and things from attachment B as well. Then what the government says is on the face of the warrant, allowing the retention of electronic equipment, yes, they were allowed to have electronic equipment from the company. That's exactly what the warrant read together means. And that's why the government was so scared and went to D.C. four years later to get a second warrant. So I have so much more to say, but I see my time is up. I would ask the court to reverse on all these issues that we raised. The warrant that Puerto Rico's status has not changed to a state and that they really went below the belt in asking about the school lunch program. I knew that would come back to bite me. Thank you, Chief Justice. All right.